IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CENTIMARK CORPORATION,<br><br>*Plaintiff,*<br><br>v.<br><br>BRYCEN RIBORDY *and* CHERRY COATINGS MANAGEMENT, LLC,<br><br>*Defendants.* | Civil Action No. 2:25-cv-987<br><br>Hon. William S. Stickman IV |

### MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

On July 15, 2025, Plaintiff Centimark Corporation ("Centimark") filed suit against Defendants Brycen Ribordy ("Ribordy") and Cherry Coatings Management, LLC ("Cherry Coatings"), bringing claims under the Defend Trade Secrets Act of 2016 ("DTSA"), the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), and the common law of Pennsylvania. (ECF No. 1, ¶ 4). Centimark alleges that Ribordy violated his restrictive covenant with Centimark by unlawfully misappropriating its trade secrets, beginning employment with Cherry Coatings almost immediately after his departure from Centimark, and soliciting Centimark's customers. (*Id.*). It has moved for injunctive relief. (ECF No. 3); (ECF No. 3-1, ¶ 1). The Court held an injunction hearing on October 30, 2025 (ECF Nos. 69 and 70), and the parties submitted post-hearing briefs thereafter (ECF Nos. 72-74). For the following reasons, the Court will deny Centimark's motion.

1

I.   **FACTUAL BACKGROUND**

Centimark is a Pennsylvania-headquartered roofing and flooring contractor with over one hundred locations throughout the United States. (ECF No. 1, ¶¶ 1, 5). Before his resignation on April 10, 2025, Ribordy was a Senior Project Manager at Centimark. (*Id* at ¶ 2). He worked for Centimark's commercial flooring division, Questmark. (*Id.* at ¶¶ 17–18). Ribordy oversaw sales activity in that role, and he was tasked with generating new business, progressing projects through the sales pipeline, and transitioning projects to the operations team for installation. (*Id.* at ¶ 19). The employment agreement ("Agreement") entered between Centimark and Ribordy on July 10, 2014, bound Ribordy in three pertinent ways:

1) A confidentiality clause prohibited Ribordy from disclosing Centimark's confidential, proprietary, and trade secret information;

2) A non-competition clause restricted Ribordy from working for a Centimark competitor for twenty-four months following the end of his Centimark employment, and;

3) A non-solicitation clause restricted Ribordy from soliciting Centimark's current and prospective customers for twenty-four months.

(ECF No. 1, ¶¶ 3, 16).

Centimark alleges that Ribordy violated all three clauses of the Agreement. (*Id.* at ¶¶ 63–65). It claims that he has violated the confidentiality clause by misappropriating Centimark's trade secrets, the non-competition clause by working for Cherry Coatings, and the non-solicitation clause by soliciting business from Centimark customers. (*Id.*).

With respect to confidentiality, Centimark claims that Ribordy downloaded and printed a "significant number of [confidential] documents" in the weeks preceding his resignation. (*Id.* at ¶

37). Specifically, Centimark alleges that those documents included human resources information, expense forms, company policies and procedures, sales description forms, key points of contact for major clients, bidding and pricing strategies, specialized pricing information from vendors, and other sensitive information related to sales. (*Id.* at ¶ 39). Centimark claims that these documents are valuable because they are secret. Accordingly, if they were to be possessed by a competitor, Centimark alleges that its business would be undermined in the price-sensitive flooring industry. (*Id.* at ¶ 40–42). It also claims that Ribordy had no employment-related reason to access and download Centimark's trade secrets in the waning days of his employment. (*Id.* at ¶ 43).

As to non-competition and non-solicitation, Ribordy's Agreement with Centimark prohibited him from working for a Centimark competitor for twenty-four months following the end of his Centimark employment. (*Id.* at ¶ 3). It also prevented him from soliciting Centimark customers for two years thereafter, with "customer" defined as any person or entity who procured, or agreed to procure, Centimark's products or services during Ribordy's final three years of employment. (*Id.* at ¶ 30). A "prospective customer" was defined as a person or entity contacted for the sake of doing business or solicited by Centimark during Ribordy's final two years of employment. (*Id.*). Centimark claims that Cherry Coatings is its direct competitor. (*Id.* at ¶ 47). Centimark alleges that before Ribordy joined Cherry Coatings he failed to submit a bid for a project that Cherry Coatings later won (despite Centimark's lower bid). (*Id.* at ¶ 51–53). Centimark also alleges that Cherry Coatings became a bidding finalist on another project only after Ribordy began working there, even though Cherry Coatings had not originally bid on that project (and ostensibly because Ribordy was familiar with Centimark's bidding strategy on that project, as well as the project's general contractor, from his time at Centimark). (*Id.* at ¶ 54–58).

Based on these allegations, Centimark seeks a variety of injunctive relief. It requests that Ribordy be enjoined from working directly or indirectly for Cherry Coatings in a capacity competitive to Centimark for a period of twenty-four months, and vice-versa. (*Id.* at p. 17.). It requests that Ribordy and Cherry Coatings be enjoined from disclosing or using Centimark's confidential, proprietary, and trade secret information. (*Id.*). And it requests that the Court order and require Ribordy to comply with the terms of the Agreement and its restrictive covenants. (*Id.*).

## II.    STANDARD OF REVIEW

The grant or denial of a preliminary injunction is within the sound discretion of a district court. *Reilly v. City of Harrisburg*, 858 F.3d 173, 178–79 (3d Cir. 2017) ("District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.'" (internal citation omitted)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). The status quo refers to "the last, peaceable, noncontested status of the parties." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Rather, such relief "should be granted only in limited circumstances." *Kos Pharms.*, 369 F.3d at 708 (internal citation omitted). A moving party "must establish entitlement to relief by clear evidence." *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (internal citations omitted). Specifically, the movant must demonstrate: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms.*, 369 F.3d at 708; *see also*

*Winter*, 555 U.S. at 20. The first two factors are "the most critical," and the moving party bears the burden of making the requisite showings. *Reilly*, 858 F.3d at 176, 179 (internal citations omitted). Once those "gateway factors" are met, a court should "consider[] the remaining two factors" and then "determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

In reaching its decision on a request for injunctive relief, a district court sits as both the trier of fact and the arbiter of legal disputes. A court must, therefore, make "findings of fact and conclusions of law upon the granting or refusing of a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) (citing FED. R. CIV. P. 52(a)(2)). This "mandatory" requirement of Federal Rule of Civil Procedure 52(a)(2) must be met "even when there has been no evidentiary hearing on the motion." *Id.* Nevertheless, at the preliminary injunction stage, "procedures . . . are less formal and evidence is less complete than in a trial on the merits." *Kos Pharms.*, 369 F.3d at 718; *see also AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) ("[T]he grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing [that] is the responsibility of the district judge." (internal citations omitted)). Accordingly, a court "may rely on affidavits and hearsay materials which would not be admissible evidence." *Kos Pharms.*, 369 F.3d at 718 (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). The weight given to such materials will "vary greatly depending on the facts and circumstances of a given case." *Id.* at 719. The Court is also tasked with assessing the credibility of witness testimony and may base the decision to grant or deny a preliminary injunction on credibility determinations. *See Hudson Glob. Res. Holdings, Inc. v. Hill*, No. 02:07CV0132, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007).

### III. ANALYSIS

For the following reasons, the Court will deny preliminary injunctive relief. Because Centimark has not met its threshold showing, the Court only sets forth its analysis of the "gateway" factors necessary to obtain a preliminary injunction–Centimark's reasonable likelihood of success on the merits and its possibility of irreparable harm absent injunctive relief. *See Reilly*, 858 F.3d at 178 (explaining that a court proceeds to balance the equities and consider the public interest only after a movant meets its threshold showing). Also, because the Court has dismissed Cherry Coatings for a lack of personal jurisdiction, the motion is only considered as to Ribordy. *See* ECF Nos. 75-76.

#### A. Centimark has not demonstrated a reasonable likelihood of success on the merits.

A demonstration that a movant can win on the merits requires a party to show that its chances are "significantly better than negligible" but "not necessarily more likely than not." *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018) (citing *Reilly*, 858 F.3d at 179). Centimark's burden of proof lies in between those standards, and a preliminary injunction is unwarranted if it would essentially resolve this case on the merits. *See Del. State Sportsmen's Assoc., Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 197 (3d Cir. 2024) (stating that a preliminary injunction motion is not a shortcut to the merits, and key to a district court's discretion is whether an injunction would jeopardize its ability to "see a case through."). Here, enjoining Ribordy from working for Cherry Coatings would be such a shortcut. A preliminary injunction would unduly disrupt the status quo, and the Court does not find a reasonable likelihood that Ribordy breached the Agreement, misappropriated Centimark's trade secret information, or breached his duty of loyalty.

### *1. It is not reasonably likely that Ribordy breached his employment agreement.*

It is well-settled under Pennsylvania law that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002). Furthermore, a restrictive covenant, like the Agreement between Centimark and Ribordy, is enforceable if: (1) it is ancillary to an employment relationship between the parties, (2) supported by adequate consideration, (3) the restrictions imposed are reasonably limited in duration and geographic extent, and (4) the restrictions imposed by the covenant are reasonably necessary for the protection of the employer. *Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 249 A.3d 918, 932 (Pa. 2021). A post-employment restriction of a former employee is only enforceable if it exists to protect an employer's legitimate business interests, and such interests include trade secrets, confidential information, good will, and unique and extraordinary skills. *Hess v. Gebhard*, 808 A.2d 912, 918–920 (Pa. 2002) (citation omitted). Restrictive covenants are a strongly disfavored trade restraint under Pennsylvania law, and while enforceable, its courts view them as unique and placing a heavy burden upon an employee's ability to earn a living. *Socko v. Mid-Atlantic Systems of CPA, Inc.*, 126 A.3d 1266, 1277–78 (Pa. 2015).

The Agreement between Centimark and Ribordy is a contractual and enforceable covenant. It was entered expressly incident to their employment relationship, was supported by consideration, is geographically limited, and its restrictions protect Centimark's confidential information and trade secrets. (ECF No. 1-2). For the reasons set forth below, the Court does not at this stage find a reasonable likelihood that Ribordy breached the Agreement's restrictions on competition and solicitation; a separate analysis regarding trade secret misappropriation follows.

With respect to competition, the Agreement defines its "Restrictions on Competition" as such:

> Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder or otherwise, alone or in association with any other person, corporation or other entity, in any Competing Business in a Restricted Area during his employment and for two (2) years from the date of termination (regardless of the reason) of Employee's employment with CENTIMARK ("Restricted Period").

(ECF No. 1-2, pp. 10–11). Furthermore, a "competing business" is defined as:

> any person, business, enterprise or other entity which directly or indirectly sells or attempts to sell any products or services, or any combination thereof, which are the same as, or similar to, the products and/or services sold or offered by Centimark at any time during the last three (3) years that Employee was employed by CENTIMARK.

(*Id.* at p. 11). And "restricted area" is defined as "that area comprised of all the territory(ies), county(ies), district(s) or other geographical designations in which Employee has operated as an Employee of Centimark at any time during the two (2) year period just prior to Employee's termination." (*Id.*).

Centimark maintains that Ribordy's employment with Cherry Coatings, which it views as its direct competitor, is a plain violation of the restriction on competition. (ECF No. 4, p. 6). Cherry Coatings does business in the same industry as Centimark as it also sells and installs commercial flooring and coatings. (*Id.* at p. 13). Cherry Coatings is active in the Arizona market, which Ribordy was responsible for during his time at Centimark. (*Id.* at p. 11). However, he also built and maintained sales relationships in New Mexico, and "for the last three or four years," southern California and parts of Utah and Colorado. (*Id.* at 11). Ribordy currently works as a Vice President of Flooring at Cherry Coatings. (ECF No. 70, p. 69). He was a Project Manager at Centimark, which meant that he was responsible for sales. (*Id.*). In his new position at Cherry Coatings, Ribordy is not responsible for, nor does he engage in, sales or project bidding. (*Id.* at p.

70).  He works in operations and he does not oversee any individuals who have sales responsibilities. (*Id.* at pp. 70–71).

Furthermore, it was Ribordy's understanding that the Agreement's restriction on competition solely applied to his performance of a sales role. (ECF No. 70, p. 187).  Centimark never explained to Ribordy how it construed the restriction on competition, nor did it provide any further guidance about what "competition" or "restricted area" meant. (*Id.* at 186).  Ribordy considers his current responsibilities in operations to be completely different than his sales role at Centimark. (*Id.* at 70).  Although Centimark and Cherry Coatings both operate in the same industry in Arizona, Ribordy's responsibilities in the state are completely different for each company, and his work for either is not exclusive to Arizona.  Given the material difference in Ribordy's role and responsibilities between Centimark and Cherry Coatings, and his understanding that his covenant not to compete was for sales alone, it is not reasonably likely that Ribordy breached his restriction on competition.

With respect to solicitation, Article 4.05 of the Agreement prohibited Ribordy from soliciting business from customers or prospective customers of Centimark for two years post-termination. (*Id.* at p. 11).  It reads as follows:

> Employee agrees that during his employment and for the two (2) year period immediately following his employment with CENTIMARK (regardless of the reason for termination), Employee will not, directly or indirectly, solicit the trade of, trade with, contact for business purposes or accept business from any Customer or Prospective Customer of CENTIMARK other than for the benefit of CENTIMARK.  For the purpose of this Agreement, the term "Customer" shall mean any person or entity that has procured or agreed to procure CENTIMARK's products or services at any time during Employee's final three (3) years of employment with CENTIMARK and the term "Prospective Customer" shall mean any person or entity that has not yet become a Customer of CENTIMARK but that has been contacted for the sake of doing business or solicited by CENTIMARK during Employee's final two (2) years of employment with CENTIMARK.

(*Id.*).

In support of its allegation that Ribordy has solicited Centimark customers, Centimark points to instances where Cherry Coatings competed for project bids that he either worked on or knew about while at Centimark. (ECF No. 4, p. 6); (ECF No. 1, ¶¶ 44–58). Despite his contrary assertions, Centimark argues that Ribordy's visits to job sites and meetings with clients on behalf of Cherry Coatings were actually "sales" activities in violation of the Agreement. (ECF 72, p. 5). It specifically disputes that Ribordy's meeting on behalf of Cherry Coatings with the general contractor of the "TSMC Phase 3" project were for operational purposes, noting that Cherry Coatings won that bid after Ribordy began working there. (*Id*. at p. 4). However, the broader record demonstrates that those visits and meetings, including about TSMC Phase 3, were to supervise project managers and inspect their work on projects that were already awarded to Cherry Coatings. (ECF 70, pp. 34–35, 56). No evidence has been adduced that Ribordy contacted any customers on behalf of Cherry Coatings, nor has it been shown that he was involved in its project bidding at all. Instead, Ribordy expressly denies being involved in bid proposals at Cherry Coatings as its bidding is exclusively handled by a "hub" in Dallas. (*Id*. at p. 70). Since nothing has been introduced to contradict those representations, the Court does not find it reasonably likely that Ribordy has solicited Centimark's customers in violation of the Agreement.

## 2. *It is not reasonably likely that Ribordy misappropriated Centimark's trade secrets.*

To prevail on a trade secret misappropriation claim, a plaintiff must prove both the existence of a protectable trade secret and its misappropriation. *Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*, 152 F.4th 516, 527 (3d Cir. 2025). The DTSA and PUTSA "essentially protect the same information" and are substantially similar, except for the DTSA's jurisdictional hook and some "different wording." *Id*. Consistent with precedent from the United States Court of Appeals for the Third Circuit, the Court interprets these statutes together.

A protectable "trade secret" is defined as information in any form that the owner "has taken reasonable measures to keep … secret," which "derives independent economic value … from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from [it]." *Id.* (citing 18 U.S.C. § 1839(3)). "Misappropriation" is defined as "improper acquisition, disclosure, or use of a trade secret without consent." *Id.*

Centimark's at-issue proprietary and confidential information falls within the definition of trade secret. That information derives independent economic value from its secrecy, and it includes human resources information, expense forms, company policies and procedures, sales description forms, key points of contact for major clients, bidding and pricing strategies, specialized pricing information from vendors, and other sensitive information related to sales. Centimark has also kept it secret through reasonable measures, like limiting access to it, password protecting its file portal, and requiring employees to enter confidentiality agreements. (ECF No. 4, p. 8).

Centimark claims that Ribordy shared its trade secrets with Cherry Coatings. (*Id.*). The Court does not find a reasonable likelihood that he did. Centimark retained Computer Forensics Expert Jefford Englander ("Englander") to analyze Ribordy's Centimark-issued laptop and cellular telephone. The purpose of Englander's analysis was to determine whether Ribordy's devices contained evidence of confidential Centimark documents having been copied to external storage locations outside of Centimark's control. (ECF No. 55, ¶ 5); (ECF No. 70, p. 123). In his declaration, Englander reported that Ribordy downloaded a variety of documents between March 18, 2025, and April 8, 2025, to his Centimark laptop. (ECF No. 55, ¶ 11). Those documents included sales reports, documents related to bids, and pricing information. (*Id.*). On March 25,

2025, Ribordy accessed and downloaded sixteen documents that comprised approximately 28 MB of data. (*Id.* at ¶ 12). Centimark argues that Ribordy was unauthorized to download or print those documents. (ECF No. 72, p. 6). Nothing in the record indicates that to be true. He was still employed by Centimark when he did as he resigned on April 10, 2025. (ECF No. 1, ¶ 2). At the hearing, Ribordy testified about his access to the documents and credibly explained the legitimate business reasons that caused him to access them. (*Id.* at 164–167). Moreover, Englander testified that he has no opinion, statement, or conclusion as to whether Ribordy's laptop bore evidence of Centimark documents having been copied to an external source beyond it. (ECF No. 70, p. 123). Centimark has offered no evidence that Ribordy accessed any of the documents for improper reasons. Centimark invites the Court to speculate that Ribordy did so in anticipation of his upcoming resignation. The Court declines to speculate. Accordingly, it cannot find a reasonable likelihood of success that Ribordy misappropriated Centimark's trade secrets.

### 3. *It is not reasonably likely that Ribordy breached his duty of loyalty.*

To prove a breach of the duty of loyalty under Pennsylvania law, a party must show that an employee: (1) negligently failed to act in good faith and solely for his employer's benefit, (2) that the employer was injured, and (3) that the employee's failure to act for the sole benefit of the employer was a "real factor" in causing the employer's injuries. *NRA Grp., LLC v. Durenleau*, 154 F.4th 153, 173 (3d Cir. 2025) (citations omitted).

Centimark claims that Ribordy breached his duty of loyalty by "misappropriating Centimark's confidential, proprietary, and trade secret information during his employment and sharing it with Cherry Coatings to allow the latter to unfairly compete with Centimark [.]" (ECF No. 1, ¶ 94). As with its trade secret claims, Centimark argues that Ribordy undercut its business by either failing to submit a bid that Cherry Coatings later won or by sharing information that

made Cherry Coatings competitive for another bid. (ECF No. 1, ¶¶ 96–102). However, the Court does not find that Ribordy undertook that course of action, and it cannot do so absent a more specific showing. Therefore, it is not reasonably likely that Ribordy breached his duty of loyalty to Centimark.

### B. Centimark has not shown that it will suffer irreparable harm absent an injunction.

Irreparable harm is harm that cannot be redressed by a legal or an equitable remedy following a trial, and its presence cannot be speculative. *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 610 (3d Cir. 2024) (citations omitted). And a mere "possibility" that a moving party may suffer irreparable harm is not sufficient to issue an injunction–irreparable harm must be *likely* to occur without one. *Winter*, 555 U.S. at 22 (emphasis original).

Here, irreparable harm to Centimark is not likely to occur absent an injunction. Given the facts before the Court, it is not evident that Ribordy has misappropriated Centimark's trade secrets. Centimark argues that Ribordy is using his relationships developed at Centimark for Cherry Coatings' benefit. (ECF No. 72, p. 8). It further argues that even Ribordy's knowledge of its confidential customer and pricing information raises the threat of irreparable harm. (*Id.*). Nothing before the Court indicates that Ribordy's departure and subsequent employment by Cherry Coatings has undermined Centimark's business in Arizona or elsewhere. Also notable is that Ribordy departed Centimark in April 2025, but Centimark did not file suit until July 15, 2025. (ECF No. 1, ¶ 4). At no point during the pendency of its motion did Centimark impress upon the Court the need for an immediate hearing, nor did it make a showing that it has suffered, or would suffer, great harm without one. A classic maxim of equity is that it "assists the diligent, not the tardy." *Del. State Sportsmen's Ass'n, Inc.*, 108 F.4th at 206 (citation omitted). The logic behind preliminary injunctions is an urgent need for speedy action to protect a plaintiff's rights, and a

13

delay in seeking enforcement of those rights tends to indicate a reduced need for drastic action. *Id.* As does Centimark's delay. An injunction here would severely disrupt the status quo and is unnecessary for case preservation. Nor is one necessary to protect Centimark's business, and no evidence exists that Ribordy misappropriated its trade secrets. The Court holds that Centimark has not met its burden of demonstrating irreparable harm.[1]

## IV.  CONCLUSION

A preliminary injunction is an extraordinary equitable remedy that is never awarded as of right. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citing *Winter*, 555 U.S. at 24)). Because a preliminary injunction is extraordinary, courts are to only grant them in limited circumstances. *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 218 (3d Cir. 2025) (citing *Issa v. Sch. Dist.*, 847 F.3d 121, 132 (3d Cir. 2017). The limited circumstances necessary to grant one are not present here. Centimark's motion for a preliminary injunction will be denied by Order of Court to follow.

BY THE COURT:

/s/ William S. Stickman IV

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Dated: 12/4/2025

---

[1] Although the Court need not balance the equities or consider the public interest in an injunction, Centimark cannot meet its burden under these factors. Part of the injunctive relief sought by Centimark would certainly result in even greater harm to Ribordy than the denial of its motion would cause to itself as Centimark moves the Court to enjoin Ribordy from working at Cherry Coatings for twenty-four months from the date of the Court's prospective order. That, absent an extraordinary showing, would tip the scales of equity steeply against Ribordy. *See Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 119 (3d Cir. 2010) ("even a temporary injunction prohibiting someone from pursuing his livelihood in the manner he chooses operates as a severe restriction on him that a court should not impose lightly"). There is no public interest in an injunction here. *See id.* (citing Pennsylvania precedent that the right of an employer to protect its trade secrets must be balanced against the right of an individual to the pursuit of his chosen occupation and livelihood); *see also Sec. & Exchange Comm'n v. Chappell*, 107 F.4th 114, 139 (3d Cir. 2024) (stating that, as a practical matter, the public interest favors a plaintiff after it can demonstrate both a reasonable likelihood of success on the merits and irreparable injury).

14